VARDERMAN SHACK v. STATE OF INDIANA.

[No. 1270S290. Filed October 25, 1972.]

*Clifford G. Antcliff, Antcliff & Sargent,* of Greenwood, for appellant.

*Theodore L. Sendak,* Attorney General, *Mark Peden,* Deputy Attorney General, for appellee.

HUNTER, J.—This is an appeal by Varderman Shack, appellant (defendant below), from a conviction for First Degree Murder by which he was sentenced to life imprisonment.* Appellant was arrested in 1962 and convicted in 1963, however, in 1967 the conviction was reversed. See *Shack* v. *State* (1967), 249 Ind. 60, 206 N. E. 2d 614, 249 Ind. 67, 231 N. E. 2d 36. Appellant's second trial in 1969 resulted in a hung jury. Appellant was retried in 1970 which resulted in the conviction and life sentence. A motion to correct errors was filed and overruled. This appeal followed.

Appellant makes six main contentions of error. First, he asserts that his incarceration from 1962 until 1969 was a denial of a speedy trial and constituted cruel and unusual punishment. Secondly, he asserts that he was not brought to trial in 1970 within the time required either by the statutes or rules and therefore he should be discharged. Third, he claims his motion to strike the jury panel was erroneously overruled because irregularities occurred in the appointment of the jury commissioners and irregularities arose in selecting the panel. Fourth, he claims that certain jurors who stated on voir dire that they did not believe in the death penalty and could not vote for it under any circumstances were improperly excluded for cause. Fifth, he claims the court erroneously refused to grant a mistrial after two jurors were observed conversing with two prosecuting witnesses. Sixth, he claims that certain instructions tendered by the appellant were erroneously refused.

The first issue concerns whether the appellant was denied a speedy trial and exposed to cruel and unusual punishment arising from his incarceration from 1962 to 1969. Appellant states that five attorneys served him during that period, and that the last one, who served during the trial in question, was thus handicapped in his investigation. Additionally, the property where the crime allegedly occurred

---

* This case was reassigned to this office on August 8, 1972.

had been destroyed. We sympathize with the difficulties which both sides in the trial face when a party is tried after such a time span. It is admittedly more difficult to collect evidence and the memories of the witnesses fade. Appeals, unfortunately, are time consuming but the delay caused thereby cannot be used by the defendant to claim the denial of a speedy trial. See, *State ex rel. Walker* v. *Ratliff* (1970), 253 Ind. 495, 255 N. E. 2d 223; *United States* v. *Ewell* (1966), 383 U.S. 116. The right to a speedy trial under the Sixth and Fourteenth Amendments of the Constitution and Article I, Section 12 of the Constitution of Indiana,

> "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself. However, in large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself. Therefore, this Court has consistently been of the view that 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' Beavers v. Haubert, 198 U.S. 77, 87, 49 L. Ed. 950, 954, 25 S. Ct. 573. 'Whether delay in completing a prosecution . . . amounts to an unconstitutional deprivation of rights depends upon the circumstances. . . . The delay must not be purposeful or oppressive,' Pollard v. United States, 352 U.S. 354, 361, 1 L. Ed. 2d 393, 399, 77 S. Ct. 481. '[T]he essential ingredient is orderly expedition and not mere speed.' Smith v. United States, 360 U.S. 1, 10, 3 L. Ed. 2d 1041, 1048, 79 S. Ct. 991." *United States* v. *Ewell, supra,* at 120.

The delays between 1962 and 1969 were for the benefit of the appellant, and we cannot imagine how the ends of justice would be enhanced by his discharge based on this delay. Additionally, appellant's claim that the delay has prejudiced his defense is insubstantial and speculative. It would seem

that a certain advantage would accrue to the appellant because prior to the trial resulting in this appeal, he twice had the opportunity to see exactly what the State's case against him would be. Since no excessive delay during this period of 1962 to 1969 can be charged against the State, no constitutional denial of a speedy trial arises therefrom.

Appellant also contends that his incarceration from 1962 to 1969 was cruel and unusual punishment in violation of the Article 1, Section 16 of the Constitution of Indiana. He claims his mail was censored, his visitors limited, and that he was kept in isolation on "death row" for four years. Cruel and unusual punishment prohibits atrocious punishment but does not prohibit imprisonment. *Taylor* v. *State* (1968), 251 Ind. 236, 236 N. E. 2d 825. Four years of this seven year period, appellant was imprisoned due to his conviction for first degree murder. The rest of the time he was incarcerated during the pendency and prosecution of his trials. In no way can this incarceration be said to be excessive. See, *People* v. *Wheeler* (1971), 23 Cal. App. 3d 290, 100 Cal. Rptr. 198; *People* v. *Terry* (1969), 70 Cal. 2d 410, 77 Cal. Rptr. 460, 454 P. 2d 36. Nor can we say that isolated confinement on "death row" constitutes cruel and unusual punishment. See, *McElvaine* v. *Brush* (1891), 142 U.S. 155; *Trezza* v. *Brush* (1891), 142 U.S. 160; *Rosenburg* v. *Carroll* (S.D.N.Y. 1951), 99 F. Supp. 630. See also, *State* v. *Scott* (1972), 17 Ariz. App. 183, 496 P. 2d 609; *Adams* v. *Pate* (7th Cir. 1971), 445 F. 2d 105.

Appellant's next contention is that he was denied a speedy trial under Ind. Ann. Stat. § 9-1402 (1956 Repl.) or Rule 1-4D (the predecessor of the present CR. 4(A)), which replaced § 9-1402 in 1965, whichever is applicable. At the threshold it must be decided which is applicable, the statute or the rule. In *State ex rel. Uzelac* v. *Lake Crim. Ct.* (1965), 247 Ind. 87, 93, 212 N. E. 2d 21, 24, it was stated:

"Obviously, the end of uniformity and simplicity can be best achieved by applying Rule 1-4D to cases where 'the

criminal charge against such defendant is filed, or from the date of his arrest on such charge (whichever is later)' occurred on and after July 1, 1965, and such interpretation of the effective date of Rule 1-4D of this Court is given accordingly."

Also, it has been held that the applicable rule will be determined by the date of the proceedings which started the time running. *Johnson* v. *State* (1969), 252 Ind. 79, 246 N. E. 2d 181. Although the original indictment was filed in 1962 in Marion County, it was refiled in Johnson County on January 3, 1968. The date of the proceedings which started the time running was in 1969. Since both the date of filing the indictment in Johnson County and the date from which the time started running came after January 1, 1965, Rule 1-4D is held to be applicable to the case at bar. The pertinent portion of Rule 1-4 read:

> "1.   Defendant in Jail.—No defendant shall be detained in jail on a charge, without a trial, for a continuous period embracing more than six [6] months from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge (which ever is later) ; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last mentioned circumstances, the prosecuting attorney shall make such statement in a motion for continuance not later than ten [10] days prior to the date set for trial, or if such motion is filed less than ten [10] days prior to trial, the prosecuting attorney shall show additionally that the delay in filing the motion was not the fault of the prosecutor."

Appellant had, of course, been held in jail for more than six months but the delays had been caused by his own acts. When a defendant causes a delay during the six month period the time begins to run anew. *Summerlin* v. *State* (1971), 256 Ind. 652, 271 N. E. 2d 411. In the case at bar, appellant filed a motion for dismissal and discharge

on October 17, 1969, and moved that the trial date (then set for October 20, 1969) be continued so that he might be heard on this motion before trial. The trial court granted the continuance and set October 27, 1969 for hearing the motion for dismissal and discharge. On October 27, the court heard evidence and took the motion under advisement, giving the parties ten days to file briefs. On November 10, 1969, the appellant filed a petition for extension of time to file his brief, and finally on December 4, 1969, appellant filed his brief. On December 12, 1969, the court overruled the motion and set trial for May 4, 1970. The trial date was later moved back to May 6, 1970.

Appellant contends the time should begin to run anew from October 17, 1969, which would mean the trial came more than six months later. However, the delay caused by the appellant did not terminate until December 12, 1969, when the motion which he filed was ruled upon. In *State* v. *Hawley* (1971), 256 Ind. 244, 268 N. E. 2d 80, this Court held that where a defendant filed a motion for severance and a separate trial, he was not entitled to credit for delaying time caused by the motion, and the six-month rule for discharge began to run anew from the date the motion for severance was denied. The holding in *Hawley* is controlling of the case at bar. Six months had not elapsed from the date of the overruling of the appellant's motion on December 12, 1969 and the commencement of trial on May 6, 1970. Therefore, Rule 1-4D was not violated and appellant's motion for discharge filed April 27, 1970, was properly overruled. If appellant had truly desired a swifter adjudication, a motion for an early trial under 1-4D.2. (now CR.4(B)) was available to him. See *Summerlin* v. *State, supra.*

Appellant next asserts that it was erroneous to overrule his motion to strike the jury panel. His motion was based on the allegation that the jury commissioners were selected, sworn and instructed contrary to the statute and that the jury

panel was improperly drawn. The statute, I.C. 1971, 33-4-5-1 (Ind. Ann. Stat. § 4-7101 [1968 Repl.]), reads:

"The circuit court shall, during the month of November, appoint for the next calendar year two [2] persons, at least one [1] of whom shall be a resident of the town or city in which the court shall be held, as jury commissioners, who shall be freeholders and voters of the county, well known to be of opposite politics, and of good character for intelligence, morality and integrity, and cause them to appear and take an oath or affirmaton in open court, to be entered of record in the order-book of the court in the following form: 'You do solemnly swear (or affirm) that you will honestly, and without favor or prejudice, perform the duties of jury commissioners during your term of office, that, in selecting persons to be drawn as jurors, you will select none but persons whom you believe to be of good repute for intelligence and honesty, that you will select none whom you have been or may be requested to select, and that, in all of your selections, you will endeavor to promote only the impartial administration of justice.' The court shall thereupon instruct them concerning their duties."

Appellant contends the commissioners were not appointed during November, did not take an oral oath in open court and did not receive instructions pursuant to the statute. The evidence indicates that the commissioners were appointed in December rather than November. The statute does not require the oath to be oral. The evidence shows the commissioners signed the oath and there is nothing to indicate that this was not done in open court. Likewise, there is no evidence that instructions were not given. Even though the commissioners were appointed in December instead of November, there is no evidence that the rest of the statute was not complied with and we hold that there was substantial compliance with the statute. Appellant has failed to indicate how he was in any way prejudiced by the slight deviation which occurred. Since appellant's substantial rights were not affected by the actions complained of, he cannot claim reversal. *Pritchett* v. *State* (1924), 195 Ind. 404, 145 N. E. 488.

The second part of appellant's contention is that the jury panel was improperly drawn. The pertinent testimony of one jury commissioner, upon which appellant bases his claim, is as follows:

"Q. How are the names picked from the assessment records of Johnson County?
A. Well, we go through and we try to pick ones that we feel are qualified to be jurors.
Q. What standards do you use, as far as jurors, I mean, you stated that you went through and tried to pick ones that were qualified—and I'd just like to find out how they establish who's qualified and who's not.
A. Well, some of the older records used to show their occupations and whether or not they are married and some of your newest assessment forms don't show that.
Q. I see.
A. We try to be sure that they were over the age of 21, under the age of 65; they have been somewhat successful in life.
Q. I see. Your opinion—when you say somewhat successful in life, do you mean that they are more or less established in the county?
A. Yes, uh huh.
Q. And had been here for a few years.
A. Uh huh.
Q. This sort of thing? And you indicate, now-a-days, the assessment list don't show that occupation, at all?
A. They've changed the form on it so they don't show the occupation.
Q. Do you still make an effort to still select the same way that you did—by matter of knowledge of these people?
A. Well at the present time there are so many new people in the county that we don't know personally that we, more or less, go by every 10th or 15th person in the book, or something of that sort, to arrive at the number we need out of that particular book.
Q. If this — uh — person so picked every 10th or 15th, if you know, of your own knowledge, that there's some reason that they mght be disqualified, or you think they might be disqualified, are those random pickings then disqualified and you pick another one?

A. Yes, we'll go on to the next man.

Q. So, if you recognize the name, then you weight it, and if you don't recognize it, you go ahead and throw it into —

A. Right.

Q. Or make disqualification?

A. Right."

Appellant contends that this exchange demonstrates that those of the poorer economic class were excluded from the jury. However, the testimony above does not refer to economic class at all unless it can be inferred that "successful in life" implies economically successful. Both jury commissioners and the clerk stated that at no time did they ever systematically exclude any race, minority group, or poor persons. They stated that their primary concern was whether the people drawn were between 21 and 65. One of the commissioners explained that when a person is selected from the list there is nothing to go by except a bare name and that there is no way to tell their race, religion, or economic class. It was also stated that so many people now reside in Johnson County it is impossible for the commissioners to know more than a very small percentage of the people eligible to be jurors. The evidence indicates that no systematic exclusion of any group was practiced by these jury commissioners.

Appellant, however, also clams the system used was not random. Strict random selection is not a requirement. The law requires that the commissioners use some discretion in the selection process. See *Harrison* v. *State* (1952), 231 Ind. 147, 106 N. E. 2d 912. The major requirement should be that the system of selection is not arbitrary, see *Harrison, supra,* and complete inpartiality should be sought. See, *State* v. *Bass* (1936), 210 Ind. 181, 1 N. E. 2d 927. Thus, completely random selection is not a requirement as long as the system is impartial and not arbitrary. We should note, however, that the more random the

selection process, the less will be the appearance of arbitrariness. Such a goal should be sought.

Appellant also asserts that the panel was poisoned because the clerk alone checked the names selected against the voter registration lists to make certain that those not registered to vote were excluded. However, he does not indicate how this violates any statute. The clerk testified that she excluded only those not registered. She did not exclude anyone else when she performed this task. We fail to see how the panel was poisoned by this procedure.

The evidence indicates that no systematic exclusion of any group occurred, nor was the method of selection employed by the jury commissioners and clerk arbitrary. Therefore, no error occurred when the trial court refused to strike the entire panel.

Appellant's next contention is that certain jurors were erroneously excused for cause when, during voir dire, they stated that they did not believe in the death penalty and could not vote for it under any circumstances. He cites *Witherspoon* v. *Illinois* (1968), 391 U.S. 510, for the proposition that general objection to the death penalty is not sufficient cause to exclude a juror. However, *Witherspoon* does not affect the validity of any sentence other than death. Nor does it render invalid the *conviction* but only the *sentence*. 391 U.S. at 523. In *Bumper* v. *North Carolina* (1968), 391 U.S. 543, a companion case to *Witherspoon,* the Court held that exclusion of jurors opposing capital punishment was not reversible error where the jury imposed a life sentence. The Court stated that in order to obtain a reversal of his conviction an accused is required to adduce evidence that a jury from which those who oppose capital punishment have been removed is biased with respect to his *guilt* as well as the punishment to be imposed. In the case at bar, appellant received a life sentence, not the death penalty, and he presented no evidence that a jury so composed was biased with respect

to his guilt. Therefore, this cause is not reversible on appellant *Witherspoon's* claim and we need not reach the question of whether the facts concerning the prospective juror's scruples in the case at bar fit within the *Witherspoon* framework.

Appellant next claims that a mistrial should have been granted as requested after two jurors were observed conversing with two witnesses for the prosecution. The conversation took place on the courthouse steps during the luncheon recess. Both witnesses testified on this matter during a hearing outside the presence of the jury. They both stated that the conversation concerned nothing more than asking for directions to a "waffle house." The evidence showed the encounter took, at most, a minute or a minute and a half. The defense attorney who saw the encounter stated that all the people involved were looking in the direction of the waffle house while the conversation was occurring. Such a minor incident should not be cause for a mistrial since the pending trial was not discussed at all and the conversation was so brief. We fail to see how this innocent encounter could have prejudiced appellant or affected his receipt of a fair trial. It was therefore not erroneous for the trial court to overrule appellant's motion for a mistrial. See *Oldham* v. *State* (1967), 249 Ind. 301, 231 N. E. 2d 791; *Smith* v. *State* (1960), 241 Ind. 311, 170 N. E. 2d 794. Appellant puts emphasis on the fact that the jurors involved did not testify. However, he was given an opportunity to present evidence on this issue and at no time requested that the jurors be called as witnesses. We certainly cannot say the trial court abused its discretion by not *sua sponte* calling the jurors to testify on this issue.

Appellant also contends that the trial court erred in denying certain of his tendered instructions. He contends that his tendered instructions No. 1 and 6, both of which concerned premeditation, should have been given. However, the trial court's preliminary instruction No. 8,

which was reread as a final instruction, adequately covered this subject. It is well established that a trial court need not give a tendered instruction, notwithstanding the fact that it states a correct principle applicable to the case, where it is adequately covered by other instructions given. See cases cited in 8A I.L.E. *Criminal Law* § 592. Appellant contends that it was erroneous not to give his tendered instructions No. 5 and 8 concerning intoxication. However, this subject was adequately covered by defendant's tendered instruction No. 3 which was given. Appellant contends that it was error not to give his tendered instruction No. 13 concerning the proof of each material element of the crime beyond a reasonable doubt. However, this subject was adequately covered by the trial court's preliminary instruction No. 2, which was reread as a final instruction. Appellant contends that his tendered instruction No. 14 which concerned the juror's duty of deliberation was erroneously refused. However, this subject was adequately covered by the State's tendered instruction No. 13 which was given. Appellant contends that instruction No. 16, concerning the presumption of innocence, was erroneously refused. However, this subject was adequately covered by the trial court's preliminary instruction No. 3, which was reread as a final instruction. Appellant contends that his tendered instruction No. 18, concerning manslaughter, was erroneously refused. This, however, was adequately covered by final instruction No. 3.

Appellant also contends his tendered instruction No. 9 was erroneously refused. It reads as follows:

> "You have no right to find the defendant guilty only for the purpose of deterring others from committing the same act."

Appellant, however, fails to cite any authority in support of his claim that this instruction should have been given. We are not required to search for authority to support this contention. *Layton* v. *State* (1968), 251 Ind. 205, 240 N. E. 2d

489. Although we agree with the sentiment expressed in the instruction, we do not agree that it was erroneous to refuse to give it. Appellant's rights were protected and this same philosophy was expressed by the State's instruction No. 8 which was read to the jury.

Appellant also contends it was erroneous to refuse his tendered instruction No. 19 defining assault and assault and battery. However, a defendant charged with first degree murder may only be found guilty of a lesser degree of murder (including manslaughter) unless charged in a separate count. *Barker* v. *State* (1958), 238 Ind. 271, 150 N. E. 2d 680; IC 1971, 35-1-39-1 (Ind. Ann. Stat. § 9-1816 [1956 Repl.]). Since appellant could not be found guilty of assault or assault and battery, it was not error to refuse an instruction concerning them.

For all the foregoing reasons the judgment of the trial court is affirmed.

Judgment affirmed.

Arterburn, C.J., Givan and Prentice, JJ., concur; DeBruler, J., concurs with Opinion.

## CONCURRING OPINION

DeBruler, J.—I concur in the majority opinion but only because it is evident that the practice of the jury commissioners of selecting jurors who are "somewhat successful" is no longer followed and was not followed at the time of this trial.

A jury panel must be chosen in a manner which is impartial, does not unreasonably exclude any class of citizens and is not arbitrary in nature. *Harrison* v. *State* (1952), 231 Ind. 147, 106 N. E. 2d 912. A defendant who demonstrates that his jury was not so chosen need not show any particular harm to him resulting from the system used. *Jones* v. *Georgia* (1967), 389 U.S. 24, 88 S. Ct. 4, 19 L. Ed. 2d 25; *Whitus* v. *Georgia* (1967), 385 U.S. 545, 87 S. Ct. 643, 17 L. Ed. 2d 599;

*Brewer* v. *State* (1969), 253 Ind. 154, 252 N. E. 2d 429 (De-Bruler, J., dissenting). Neither must he prove that the jury commissioners acted in bad faith in their selection of jurors, as the good or bad faith of the selectors is not a relevant factor. *Smith* v. *Texas* (1940), 311 U.S. 128, 61 S. Ct. 164, 85 L. Ed. 84; *Brewer* v. *State, supra* (DeBruler, J., dissenting). Rather, the sole focus of the constitutional requirements here that the panels not exclude groups of citizens and that the selection of the panel not be conducted in an arbitrary manner.

Perhaps it is true as the majority writes here that we cannot assume that the "successful" standard, at one time applied by one of the commissioners, refers to economic success and that there was therefore no systematic exclusion of any group or class of citizens. On the other hand, however, it is clear that when the choice of potential jurors revolves around the commissioner's standard of "somewhat successful" the selection is patently arbitrary. Such a standard is bounded only by the whim or caprice of the one applying the test and is contrary to the goal of eliminating individual discretion, and potential discrimination, from the selection process. A system which would incorporate discretion to this extent would, in my judgment, violate constitutional requirements.

It is apparent from the testimony of the three jury commissioners, however, that this practice is no longer pursued and that the system presently employed, and used at the time of the trial here, does not incorporate arbitrary standards.

NOTE.—Reported in 288 N. E. 2d 155.